UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**TRACY ANN SCANLAN,**

    Plaintiff,

    v.                                                   Case No. 20-CV-1117

**KILOLO KIJAKAZI,**
Acting Commissioner of Social Security[1],

    Defendant.

---

## DECISION AND ORDER

---

Tracy Ann Scanlan seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for a period of disability and disability insurance benefits under the Social Security Act, 42 U.S.C. § 405(g). For the reasons below, the Commissioner's decision is affirmed and the case is dismissed.

## BACKGROUND

    *1.    Relevant Medical History*

Tracy Scanlan, who holds a master's degree in social work (Tr. 739), worked for eight years with the Green Bay School District as its home school coordinator (Tr. 52, 739). On October 22, 2013, at the age of 39, Scanlan suffered a ruptured brain aneurysm, subarachnoid hemorrhage, and vasospasm with cerebellar infarct. (Tr. 1502–06.) On November 6, 2013, she underwent a left-sided orbitozygomatic craniotomy for aneurysm clipping. (Tr. 738.) She was admitted to Bellin Rehabilitation Services on November 15, 2013, and was discharged

---

[1] The court has changed the caption to reflect Kilolo Kijakazi's appointment as acting commissioner. *See* Fed. R. Civ. P. 25(d).

on December 4, 2013. (*Id.*) During her rehab stay, Scanlan underwent cognitive retaining, with "very significant improvement" in her expressive aphasia and ataxia. (*Id.*) However, she continued to demonstrate deficits in attention and concentration, initiation, inhibition, and executive functioning, as well as having a flat affect with easy distractibility and struggled with communication. (*Id.*)

Throughout 2014, Scanlan treated with multiple providers, including her treating physiatrist, Dr. Brian Knapp. In March, Dr. Knapp noted that she was making improvements neurologically. (Tr. 1311.) He stated that Scanlan was motivated to return to work and may try to return in winter and that he did not "have any specific problems with that given the high level of function she has already regained." (Tr. 1312.) Dr. Knapp referred Scanlan to Dr. William Hitch for a neuropsychological evaluation. Dr. Hitch conducted the evaluation over two days in April to account for her fatigue. (Tr. 738–42.) He concluded that, given it was five months post-event, Scanlan was "coming along quite well" and "obviously has some very good healing time in front of her." (Tr. 741.) Dr. Hitch found Scanlan "vocationally disabled from her previous position doing school social work-related activities at this time," but would reassess the possibility of returning to work in the future. (*Id.*)

In June, Dr. Knapp noted that Scanlan "looks very good today, fantastic really." (Tr. 1306.) He stated that she continues to make "really nice recovery" and that he was "very excited about her progress today." (*Id.*) Dr. Knapp recommended Scanlan test again with Dr. Hitch in three months to see whether he believed she was capable of returning to full-time work. (*Id.*) Dr. Knapp stated that he thought Scanlan would be capable of returning to work full-time "in the relatively near future." (*Id.*) In September, Dr. Knapp noted that Scanlan had a good summer and had made a lot of gains in her fitness and confidence. (Tr. 1301.) Dr.

Knapp noted that Scanlan was "still off work and is not in school at this time," and "did not follow up with neuropsychology as I had requested." (*Id.*) Dr. Knapp stated that Scanlan "has made phenomenal recovery" and "continues to progress further in regards to her brain injury recovery." (*Id.*) He again suggested that she follow-up with Dr. Hitch for repeat neuropsychological evaluation. (*Id.*) Dr. Knapp opined that Scanlan was "most likely currently operating and [sic] above average intellectual level, with some short-term memory difficulty." (*Id.*) In November, Scanlan treated with Dr. Mustafa Baskaya at the University of Wisconsin Hospital. (Tr. 1054–55.) Dr. Baskaya noted that Scanlan made a "remarkable recovery," that she was home working with her kids, and exercised daily. (Tr. 1055.)

On December 16, 2014, Scanlan underwent a repeat neuropsychological evaluation with Dr. Hitch. (Tr. 735–37.) Dr. Hitch opined that Scanlan had shown improvement in her overall neurocognitive functioning since last spring, but continued to demonstrate rather significant concerns in her attention and concentration, and that her verbal intellectual and executive functioning likely lagged behind her premorbid standards. (Tr. 736.) However, even below her premorbid standards, Scanlan scored at low-average levels in attention and concentration. (Tr. 735.)

Scanlan treated with Dr. Knapp in January 2015. (Tr. 1293.) Dr. Knapp again noted that Scanlan made "a phenomenal recovery" in regards to her motor and sensory function, but had also made "great gains" in executive functioning and other cognitive areas. (*Id.*) Dr. Knapp noted that Dr. Hitch's evaluation indicated that while Scanlan had not improved as markedly in her attention and concentration, that she was still in the average range for memory and low-average range for attention. (Tr. 1294.) Dr. Knapp noted that Scanlan "has decided not to return to work for now," as her "husband has been promoted to detective in

3

the police force, which brings with it more financial security for the family." (*Id.*) Dr. Knapp opined that based on Dr. Hitch's report and her history, Scanlan would meet the criteria for ADHD and would benefit from a neurostimulant and started her on a low dose of Ritalin. (*Id.*)

In approximately October 2015 (two years after the aneurysm), Scanlan testified that her short-term disability was coming to an end and that she had received a call from the Human Resources person for the Green Bay School District who told her that she had two weeks to find a job within the district or would no longer be employed there. (Tr. 48.) Thus, in December 2015, Scanlan called Dr. Knapp's office stating that after two years off work, she wanted to "give it a try and start again." (Tr. 1291.) However, since she had not treated with him since January 2015, she wanted to know whether she should be seen by Dr. Knapp first. (*Id.*) She was not seen by him, however, at this time. (Tr. 1289.)

Scanlan went back to work in February 2016 (Tr. 975) as a paraprofessional, assisting the teacher in a classroom of four-year-old students (Tr. 49–50). On February 17, 2016, Scanlan called Dr. Knapp's office asking that although she did not currently have any work restrictions, whether she could be assessed some, as she was "struggling working full time with the type of work she is doing." (Tr. 1289.) Dr. Knapp responded that he did not have any work restrictions for her, "but we could start with shorter hours and move into full time over several weeks or months. What is she asking for?" (Tr. 1290.) Although the nurse left Scanlan a message to call back, she did not. (*Id.*) In April, Scanlan left a message with Dr. Knapp's office asking about receiving Vitamin B-12 injections because she had no energy. (Tr. 975.)

Scanlan treated with Dr. Knapp on April 29, 2016. (Tr. 1263.) Dr. Knapp noted that Scanlan returned to full-time employment since their last visit. (Tr. 1264.) He noted that she was having difficulties mentally managing the job, and felt that "the major problem at this time is her coworker, [who] has not been supportive of her." (*Id.*) He stated that Scanlan planned on looking for a different job at the end of the school year. (*Id.*) Scanlan ceased taking Ritalin. (*Id.*) In his assessment, Dr. Knapp stated that Scanlan was "much better now than a year ago" and that she was "able to manage full time employment." (*Id.*) While she found maintaining attention, especially during multitasking, more difficult than she did before her aneurysm, she had "clearly improved such that she is able to live a basically normal life at this point." (*Id.*) Dr. Knapp also stated that while a stimulant (such as Ritalin) may assist her, she was not interested in taking one again. (*Id.*) During her follow-up examination at the University of Wisconsin Hospital neurosurgery clinic, the nurse practitioner noted that Scanlan had made "an excellent recovery," reported "overall good health," and was back to working full-time despite fatiguing easily. (Tr. 1051.)

In early March 2017, however, Scanlan was terminated from her employment. (Tr. 1261–62.) She stated that she was unable to perform well under pressure or within time constraints due to her issues with executive functioning. (Tr. 1262.) On March 23, 2017, Dr. Knapp noted that Scanlan and her husband asked whether she could file for SSDI, because "they feel that her difficulty doing that job was related to her brain injury." (*Id.*) Dr. Knapp opined that at this juncture three years post-aneurysm, she was at the end of her healing and would not recover further. (*Id.*) Dr. Knapp stated that seeking disability was "probably reasonable," but asked her to return to see Dr. Hitch for a final re-evaluation to better help him complete the paperwork. (*Id.*)

5

Dr. Hitch conducted a final neuropsychological evaluation on April 4, 2017. (Tr. 952.) Upon testing, Dr. Hitch concluded that Scanlan's attention/concentration was "low average," which was "obviously well below premorbid capabilities." (Tr. 953.) Her executive functioning was similarly average to low average in certain categories, but she was able to perform within normal limits on the Wisconsin Card Sort, "considered a cardinal test of executing functioning." (Tr. 954.) Dr. Hitch opined that Scanlan had reached a healing plateau and that she would have difficulty in a competitive work setting. (Tr. 955.) He stated that Scanlan appeared to be "vocationally disabled" and that it would be appropriate to apply for disability. (*Id.*)

On December 5, 2017, Scanlan followed-up with Dr. Knapp. He noted that Scanlan had difficulty returning to her childcare job due to the pressures of the job and the multitasking required; however, she "also had personality differences with her immediate boss, which made her decide to stop." (Tr. 1260.) Dr. Knapp noted that Scanlan wanted to return to work and given her master's degree in social work, was considering volunteering until she found something she liked, then trying to work either part-time or full-time in the future. (*Id.*)

2. *Administrative History*

On December 9, 2017, Scanlan filed an application for a period of disability and disability insurance benefits alleging disability beginning on October 22, 2013 due to her brain aneurysm. (Tr. 14.) Her application was denied initially and upon reconsideration. (*Id.*) Scanlan filed a request for a hearing, and a hearing was held before an Administrative Law Judge ("ALJ") on April 2, 2019. (Tr. 38–80.) Scanlan, her husband Philip Scanlan, and James Fuller, a vocational expert, testified at the hearing.

6

In a written decision issued June 7, 2019, the ALJ found that Scanlan was disabled from October 22, 2013 through October 22, 2015. (Tr. 23.) In so finding, he determined that during this time period, she did not engage in substantial gainful activity and had the severe impairments of history of aneurysm and neurocognitive disorder. (Tr. 18.) While the ALJ found that Scanlan did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings") (*id.*), he found that given her age, education, work experience, and residual functional capacity ("RFC"), there were no jobs that existed in significant numbers in the national economy that she could have performed. (Tr. 18–23.)

The ALJ also found, however, that Scanlan had medical improvement as of October 23, 2015, ending her disability. (Tr. 23.) He found that between October 23, 2015 and February 28, 2017, Scanlan engaged in substantial gainful activity. (*Id.*) For the remaining period (from March 1, 2017 through the date of the decision), while Scanlan did not engage in substantial gainful activity, her severe impairments remained the same but her medical improvement increased her RFC. (Tr. 23–24.) The ALJ continued to find that Scanlan did not meet a Listing and had the RFC to perform a full range of work at all exertional levels, but with the following nonexertional limitations: limited to simple, routine, and repetitive tasks; understanding, carrying out, and remembering no more than simple instructions; and low stress work, defined as jobs with no inflexible or fast-paced production requirements, involving only simple work-related decision making and no more than occasional changes in work setting. (Tr. 26.)

While the ALJ found Scanlan unable to perform her past relevant work as a case manager and teacher's aide, given her age, education, work experience, and RFC, jobs exist

in significant numbers in the national economy that she could perform. (Tr. 29–30.) As such, the ALJ found Scanlan was not disabled from October 23, 2015 to the date of the decision. (Tr. 31.) The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Scanlan's request for review. (Tr. 1–5.)

## DISCUSSION

### 1. *Applicable Legal Standards*

The Commissioner's final decision will be upheld if the ALJ applied the correct legal standards and supported his decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is not conclusive evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (internal quotation and citation omitted). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

### 2. *Application to This Case*

Scanlan challenges the ALJ's determination that she was not disabled as of October 23, 2015. A period of disability ends if the claimant shows medical improvement or engages in substantial gainful activity. *Tumminaro v. Astrue*, 671 F.3d 629, 631 (7th Cir. 2011). In this case, the ALJ determined that Scanlan engaged in substantial gainful activity from October 23, 2015 until February 28, 2017. (Tr. 23.) The ALJ further determined that Scanlan medically improved as of October 23, 2015. (*Id.*)

Scanlan argues that the ALJ erred by finding that her past relevant work constituted substantial gainful activity because it was accommodated. She further argues that the ALJ committed reversible error by arbitrarily determining that Scanlan medically improved on October 23, 2015. And finally, she argues that the ALJ failed to ensure that the VE provided a sufficient foundation and rationale for his job number estimates. I will address each argument in turn.

### 2.1 Substantial Gainful Activity

The ALJ determined that Scanlan engaged in substantial gainful activity from October 23, 2015 until February 28, 2017. (Tr. 23.) If a claimant is working and the work constitutes "substantial gainful activity," one is not disabled "regardless of [his or her] medical condition or [ ] age, education, and work experience." 20 C.F.R. § 404.1520(b). In evaluating whether a claimant has engaged in substantial gainful activity, the Administration will consider whether the work is done under special conditions that take into account one's impairments. 20 C.F.R. § 404.1573. The regulations provide that if work is done under special conditions, the Administration *may* find that it does not show the claimant has the ability to engage in substantial gainful activity. *Id.* Examples of special conditions include, receiving special

9

assistance from other employees in performing the work, being permitted to work at a lower standard of productivity or efficiency than other employees, and being given the job opportunity because of a past association with the employer or because of the employer's concern for the person's welfare. *See id.*

The ALJ found that Scanlan engaged in substantial gainful activity from October 23, 2015 through February 28, 2017 because her earnings records documented earnings in excess of substantial gainful activity during this period. (Tr. 23.) While the ALJ acknowledged Scanlan's argument that her work was accommodated, the ALJ found that Scanlan's testimony did not support such a finding. (*Id.*) The ALJ considered Scanlan's testimony that she was initially placed with a teacher who performed a greater share of the duties. (*Id.*) He also considered her testimony that she was subsequently placed with a teacher who required more assistance and Scanlan felt overwhelmed and was ultimately terminated for poor work performance and pace issues. (*Id.*) Despite this evidence, the ALJ found that Scanlan herself testified that she did not receive special accommodations. (*Id.*)

Scanlan asserts that the ALJ failed to properly consider the factors of § 404.1573(c) and generally misconstrued Scanlan's testimony. (Pl.'s Br. at 6–13.) The record is clear that Scanlan was not assessed any specific medical accommodations or restrictions by her doctor. Scanlan testified as such (Tr. 51, 55) and Dr. Knapp's notes specifically state that he did not have any work restrictions for her (Tr. 1290). What she did testify to, however, is that the first teacher she was assigned to assist "did the lion's share of the work." However, Scanlan seemingly attributed this to that teacher's personality, not to Scanlan's impairments. (Tr. 55–56.) When she switched to a different teacher who required more assistance, Scanlan testified that she could not keep up and was ultimately terminated. (Tr 58.)

10

I do not find the ALJ erred in determining Scanlan performed to the level of substantial gainful activity during the stated time period. To begin, nothing in § 404.1573(c) suggests that working under special conditions necessitates a finding that one did not engage in substantial gainful activity. Rather, the regulation provides that special accommodations *may* show one cannot engage in substantial gainful activity. As one court in this circuit stated: "The most reasonable interpretation of § 404.1573(c) is that it applies when the accommodations are so great that the employee is keeping his position only through the employer's grace rather than because of any valuable service provided to the employer." *Fitzpatrick v. Colvin*, No. 13-CV-27-BBC, 2013 WL 6869502, at *2 (W.D. Wis. Dec. 31, 2013).

Scanlan has not shown that she kept her position only through her employer's grace. The ALJ considered Scanlan's testimony that the first teacher performed a greater share of the work duties and that the second teacher required more assistance, causing Scanlan to feel overwhelmed. (Tr. 23.) However, given both Scanlan and Dr. Knapp's statements that she was given no accommodations, the ALJ's finding is supported by substantial evidence.

### 2.2 Medical Improvement

Even if the ALJ erred in finding Scanlan engaged in substantial gainful activity from October 23, 2015 through February 28, 2017, the ALJ also found that the record evidence demonstrated medical improvement as of October 23, 2015. (Tr. 23–24.) Recall that a period of disability ends if the claimant engages in substantial gainful activity *or* shows medical improvement. *See Tumminaro*, 671 F.3d at 631. The crux of Scanlan's argument of error is that the ALJ arbitrarily determined that Scanlan medically improved as of October 23, 2015. (Pl.'s Br. at 14–19.) But this is far from an arbitrary determination.

As an initial matter, Scanlan was a high-functioning individual prior to her October 22, 2013 brain aneurysm. She held a master's degree in social work and served as home school coordinator for the Green Bay School District, where she helped support at-risk Native American students. (Tr. 52.) She described her former job duties as follows:

> It kind of mimics elements of social work, but a home school coordinator, so I helped support students, at-risk students who were Native American and their families and tried to get them to grade level. So reading and writing. Also tried to incorporate cultural components so that they feel connected to their culture. So I did a lot of networking with teachers and communities, things like that.

(*Id.*) Scanlan also provided and continues to provide support to her daughter with special needs. (Tr. 46.) Scanlan testified that two years after her aneurysm (in other words, approximately October 22, 2015), her short-term disability ceased and she was told by the Green Bay School District that she either needed to return to work or be terminated from the district. (Tr. 48–49.) She decided to return to work. (Tr. 49.) Thus, Scanlan's own testimony indicates that the ALJ's finding of medical improvement on October 23, 2015 (the day after the two-years post-aneurysm date Scanlan testified to) is not an arbitrary finding. Furthermore, multiple medical providers assessed Scanlan's progress after the aneurysm as "phenomenal" and "remarkable." (Tr. 1051, 1055, 1296, 1301.) On January 21, 2015, Dr. Knapp noted that Scanlan had "decided not to return to work for now" as her "husband has been promoted to detective in the police force, which brings with it more financial security for the family." (Tr. 1294.) Scanlan did not treat with Dr. Knapp for the remainder of 2015, until she called his office in December 2015 asking whether she should be seen before returning to work given that "she hasn't been seen since January 2015." (Tr. 1291.) This evidence seems to indicate that Scanlan made a conscious decision to not work during 2015 for reasons other than her impairments.

The record shows, however, that Scanlan's circumstances changed in late 2015, triggering her decision to return to work. She testified that her short-term disability was ceasing (Tr. 48), her husband tore his Achilles tendon just before Christmas and remained on light duty with his job (Tr. 1264), and her mother, who provided a lot of assistance, moved to Florida over the winter (*id.*). Again, this indicates a conscious decision to return to work for reasons independent of her impairments.

Furthermore, Dr. Knapp clearly did not believe Scanlan needed to be seen prior to returning to work, as she began employment in February 2016 and did not treat with him again until April 2016. (Tr. 1263.) And when Dr. Knapp treated her on April 29, 2016, he noted that Scanlan had "clearly improved such that she is able to live a basically normal life at this point." (Tr. 1264.)

The record does support, however, that Scanlan struggled returning to work in a school setting. When Scanlan was terminated from her employment in March 2017, Dr. Knapp supported her applying for disability (Tr. 1261–62) going so far as stating in November 2017 that Scanlan was "certainly disabled due to this event," (Tr. 1261), being the brain aneurysm. When Dr. Knapp asked Dr. Hitch to re-evaluate Scanlan in April 2017 to assist him in completing her disability paperwork, Dr. Hitch noted that Scanlan's cognitive improvement had plateaued three and a half years post-aneurysm and determined that her scores were "reasonably consistent" with those obtained two years ago and that she "would appear to be vocationally disabled." (Tr. 954–55.)

In arguing the ALJ erred in finding medical improvement, Scanlan relies heavily on these most recent opinions from Drs. Knapp and Hitch. She argues that the ALJ credited the opinions prior to October 23, 2015, and then arbitrarily and inconsistently found the opinions

suddenly unpersuasive after that date. (Pl.'s Br. at 15–19.) But the ALJ clearly supported his reasoning for discounting the doctors' most recent opinions after the date of medical improvement. Dr. Knapp based his opinion on Dr. Hitch's neuropsychological testing. (Tr. 1457.) And, as the ALJ explained, Dr. Hitch's analysis suggests that he compared Scanlan's current test results to her premorbid levels of functioning. (Tr. 27.) The ALJ's conclusion is well supported by the record.

When Dr. Hitch first evaluated Scanlan's cognitive functioning in April 2014, his assessment heavily compared her test results to her premorbid standards. (Tr. 739–40.) He stated that Scanlan was "vocationally disabled from her previous position doing school social work-related activities." (Tr. 741.) During his subsequent testing in December 2014, Dr. Hitch again noted that Scanlan "still lags behind premorbid standards." (Tr. 736.) Thus, when Dr. Hitch called her "vocationally disabled" in April 2017 and again compared her current test results to her premorbid condition, it was entirely reasonable for the ALJ to discount the doctors' opinions on this basis. The ALJ further supported his conclusion by considering Scanlan's actual test results from April 2017, which showed that her verbal intellectual functioning was average, her memory scores were average to low-average, her attention/concentration scores were low-average, and her executive functioning scores were average to low-average. (Tr. 26–27, 953–54.) While these scores may be, as Dr. Hitch notes, "well below premorbid capabilities" (Tr. 953), that does not necessarily translate to disability under the Social Security standards.

And the ALJ indeed found that Scanlan was incapable of performing her past relevant work given her limitations from the brain aneurysm, including decreased focus and concentration and increased fatigue. (Tr. 28–30.) However, the ALJ explained that he

accounted for these limitations in the RFC (Tr. 28) and found she could perform other significant work in the national economy within these limitations (Tr. 30–31). For these reasons, I find the ALJ's determination of medical improvement as of October 23, 2015 supported by substantial evidence.

### 2.3 Vocational Expert Testimony Based Upon Reliable Method

Finally, Scanlan argues that the method used by the VE to arrive at his jobs estimates lacks foundation under *Chavez v. Berryhill*, 895 F.3d 962 (7th Cir. 2018) and thus the ALJ could not rely on the testimony to meet the Commissioner's burden of proof at Step Five. (Pl.'s Br. at 19–25.)

At Step Five, an ALJ carries the burden in demonstrating with substantial evidence that jobs exist in significant number suitable for someone with the claimant's residual functional capacity. *Chavez*, 895 F.3d at 964. "In the context of job-number estimates, . . . the substantial evidence standard requires the ALJ to ensure the approximation is the product of a reliable method." *Id.* at 968 (citing *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)). "Before accepting a VE's job number estimate, the ALJ, when confronted by a claimant's challenge, must require the VE to offer a reasoned and principled explanation." *Id.* at 970. This is not a formalistic exercise but a pragmatic requirement designed to ensure the reliability of the job numbers; the ALJ is not required to extensively question a VE if there are "sufficient indicia of reliability" as to the VE's testimony to support a conclusion about the applicant's ability to work. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1157 (2019).

In this case, Scanlan's counsel asked the VE whether he used the equal distribution method for arriving at his job numbers. (Tr. 74.) When the VE said that he did not, counsel asked the VE what method he did use. The VE responded by explaining his process for

15

coming up with approximately 190,000 assembler jobs in the national economy within the parameters set by the ALJ. (Tr. 72.):

- The VE testified that he started with data from the Bureau of Labor Statistics to determine the gross number of jobs available for a profession. He testified that in the case of an assembler, the BLS states that over five million jobs are available in the national economy (Tr. 74);
- He testified that he then reduced the numbers based on the hypothetical given to him by the ALJ. In this case, the ALJ's hypothetical limited the person to light work. (Tr. 72.) The VE testified that approximately 20-30 percent of assembly jobs in the national economy are performed at the light and sedentary levels. (Tr. 74– 75.) Thus, he reduced the initial number of five million by 30 percent to obtain the number of 1.5 million jobs. (Tr. 76);
- The ALJ's hypothetical also limited the person to simple, routine, repetitive tasks. (Tr. 72.) The VE testified that approximately 20 percent of assembly jobs are within the simple, routine, repetitive limitation. (Tr. 76.) He testified that this left 300,000 jobs in the national economy. (*Id.*);
- Finally, the ALJ's hypothetical was limited to no fast-paced production requirements such as assembly line work. (Tr. 72.) The VE testified that he reached his number of 190,000 available jobs by reducing 300,000 based on "bench work versus convey system." (Tr. 76.) He explained that he cut 110,000 jobs off because there are many types of assembler jobs such as product assembler and bench assembler that are not performed on a conveyor system. (Tr. 77.)

Thus, contrary to Scanlan's argument, the VE did not pull his numbers "out of thin air." (Pl.'s Br. at 24.) The VE clearly had a methodology that was understandable and reproducible, as I have done above from the VE's testimony. The crux of Scanlan's argument is not truly that the VE lacks a methodology, but he challenges the quality of the data. It is true that the percentages the VE used to reduce the original number he took from the Bureau of Labor Statistics were based on his experience, which he testified included observing work as it is performed, discussing these issues with employers and employees, and participating in over 25,000 hearings where people testified as to how jobs are performed. (Tr. 75.) Scanlan argues that the VE's testimony "is suspect given that the method was admittedly based only in experience." (Pl.'s Br. at 25.)

But Scanlan did not object to the VE serving as vocational expert. (Tr. 70.) If Scanlan objected to the VE's qualifications as an expert, she should have lodged her objection at the hearing. Scanlan did not question the VE regarding his level of experience and how it assisted him in reaching his opinion; rather, counsel pressed the VE to provide a "mathematical methodology" for arriving at his numbers. (Tr. 76.) As one court in this District stated, however, "whatever weakness the VE's testimony may have due to the failure to provide back-up information, generally goes to the weight the ALJ gives the testimony, not its admissibility." *LaPierre-Poff v. Saul*, No. 20-C-819, 2021 WL 1171692, at *5 (E.D. Wis. Mar. 29, 2021). A VE is entitled to support his job number approximations "by, for example, drawing on knowledge of labor market conditions and occupational trends, gleaned from reviewing relevant data sources or from placing workers in jobs." *Chavez*, 895 F.3d at 970. There would be little point to using an "expert" if the expert could not rely on his relevant experience. Otherwise, if some mathematical formula existed, a machine could simply

perform the calculation. Clearly some benefit comes from having a person with relevant experience testifying at these hearings. In sum, the ALJ did not err under *Chavez* in relying on the VE's testimony. The VE had a methodology that is understandable and re-creatable and to the extent Scanlan now challenges the VE's reliance on his experience in addition to the numbers from the Bureau of Labor Statistics (Tr. 76), Scanlan should have objected to the VE's qualifications to testify or otherwise questioned how his experience supported the reduction in numbers leading him to his final results *See Coyier v. Saul*, 860 F. App'x 426, 426 (7th Cir. 2021) ("Counsel's failure to avail himself of the opportunity to develop an argument about the expert's estimates is a waiver.").

For these reasons, the decision is affirmed.

## CONCLUSION

Scanlan alleges multiple errors in the ALJ's decision denying her disability claim. I find the decision is supported by substantial evidence and affirm. The case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the Commissioner's decision is **AFFIRMED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 24th day of February, 2022.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge